Dennis F. Dunne                          Thomas R. Kreller (*pro hac vice* pending)
**MILBANK LLP**                          **MILBANK LLP**
55 Hudson Yards                          2029 Century Park East
New York, New York 10001                 33rd Floor
Telephone:    (212) 530-5000             Los Angeles, California 90067
Facsimile:    (212) 530-5219             Telephone:    (424) 386-4000
                                         Facsimile:    (213) 629-5063

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| BOART LONGYEAR LIMITED *et al.*, | ) | Case No. 21-11465 (__) |
| | ) | |
| Debtors in a Foreign Proceeding.[1] | ) | (Joint Administration Requested) |
| | ) | |

**VERIFIED PETITION FOR**
**RECOGNITION OF FOREIGN MAIN PROCEEDING**
**AND MOTION FOR ORDER GRANTING RELATED RELIEF**

Nora R. Pincus, in her capacity as the duly authorized foreign representative (the "Foreign

Representative") of Boart Longyear Limited ("BLY") and each of the other above-captioned

debtors (collectively, the "Debtors" and, together with their non-debtor affiliates, "Boart

Longyear"), with respect to the proceeding (the "Australian Proceeding") pending before the

Supreme Court of New South Wales, Sydney, Australia (the "Australian Court"), through which

the Debtors seek sanction of two proposed schemes of arrangement (the "Schemes") under the

Corporations Act 2001 (Commonwealth of Australia) (the "Corporations Act"), files this verified

petition (the "Verified Petition") for, among other things, recognition of the Australian Proceeding

---

[1] The debtors in these chapter 15 cases, along with the last three digits of each debtor's Australian Company Number, are: Boart Longyear Limited (728), Boart Longyear Management Pty Limited (545), Boart Longyear Australia Pty Limited (025), Boart Longyear Investments Pty Limited (373), and Votraint No. 1609 Pty Limited (272).

1

as a foreign main proceeding pursuant to chapter 15 of title 11 of the United States Code (the "Bankruptcy Code").[2]

In support of the Verified Petition and the relief sought herein, contemporaneously herewith, the Foreign Representative has filed her *Declaration of Nora R. Pincus in Support of Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Related Relief* [Docket No. 3] (the "Pincus Declaration") and the *Declaration of James Marshall in Support of Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Related Relief* [Docket No. 4] (the "Marshall Declaration"), each of which is incorporated herein by reference.

## PRELIMINARY STATEMENT

1.      Established in 1890, Boart Longyear is in its 131st year as the world's leading provider of drilling services, orebody-data-collection technology, and innovative, safe, and productivity-driven drilling equipment. With its main focus in mining and exploration activities spanning a wide range of commodities, including copper, gold, nickel, zinc, uranium, and other metals and minerals, Boart Longyear also has a substantial presence in the energy, oil sands exploration, and environmental sectors. BLY, the Boart Longyear corporate parent, trades on the Australian Securities Exchange.

2.      Boart Longyear has approximately $900 million in financial indebtedness, including approximately: (a) $348,492,360 of Secured Notes (as defined below), (b) $93,944,522 of Unsecured Notes (as defined below), and (c) $353,622,291 of secured loans under Term Loan

---

[2]    On this same date (the "Petition Date"), the Foreign Representative filed the Chapter 15 Petition for Recognition of a Foreign Proceeding (Official Form 401) for each Debtor [Docket No. 1 in each chapter 15 case, respectively] (these petitions, together with the Verified Petition, collectively, the "Petition").

Facilities (as defined below).[3]  Through the Schemes, such indebtedness will be converted into shares of common equity equal to 98.5% of reorganized BLY's equity (the "New Common Equity").  As a result, Boart Longyear's funded debt will be reduced by approximately $795 million, or by approximately 85%, thereby lowering interest expenses and enhancing liquidity to support the Debtors' operations and future growth.

3.     The Schemes have nearly unanimous creditor approval: over 99% of secured creditors and over 98% of unsecured creditors holding such indebtedness support the Schemes.

4.     However, orders entered by the Australian Court may not be binding on any dissenting creditors whose contractual rights are governed by the laws of the United States who may undertake enforcement actions in the United States.  To prevent such creditors from frustrating the purpose of the restructuring—to maximize value for *all* creditors—the Foreign Representative commenced these chapter 15 cases (the "Chapter 15 Cases"), seeking recognition of the Australian Proceeding as a foreign main proceeding and certain related ancillary relief.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and the *Amended Standing Order of Reference* dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.     Venue is proper pursuant to 28 U.S.C. § 1410.

---

[3]   Each of the indentures under which the outstanding Secured and Unsecured Notes have been issued, with respect to which each Debtor is either an issuer or a guarantor, is governed by New York law and names New York as the preferred forum for conflict resolution.  Relevant extracts from the indentures are attached to the Pincus Declaration as **Exhibits D-E**.  Likewise, the Term Loan Facilities, under which each of the Debtors is either a borrower or a guarantor, is governed by New York law and names New York as the preferred forum for conflict resolution.  Relevant extracts from the Term Loan Facilities are attached to the Pincus Declaration as **Exhibits F-G**.

7.      The bases for the relief requested herein are sections 105(a), 1504, 1507, 1509, 1515, 1517, 1520, 1521, and 1525 of the Bankruptcy Code.

## BACKGROUND

### A.      Company Overview

8.      Boart Longyear is among the world's leading providers of drilling services, drilling equipment, and performance tooling for mining and drilling companies.  Boart Longyear also has a significant presence in aftermarket parts and services, energy, mine de-watering, oil sands exploration, and production drilling.

9.      Boart Longyear was founded in 1890.  Its predecessor, Longyear Company, grew to become an important player in many well-known projects, including determining the strength of the rock foundation for the Golden Gate Bridge in San Francisco.  Boart International, founded in 1936 as a subsidiary of De Beers, the global diamond mining concern, engaged in developing industrial applications for diamonds.  Boart International became well known for its innovations in diamond drilling, such as patenting the world's first wireline core retrieval system, which both increased global production and made extraction safer and more reliable.

10.     Longyear Company was acquired by Boart International in 1974 and formally merged into Boart Longyear in 1994.  In 2006, an Australian bank, Macquarie Bank, purchased Boart Longyear and took it public the following year.  Its initial public offering in 2007 was the second-largest in Australian history at approximately Australian Dollar $2.3 billion.

### B.      Boart Longyear's Businesses

11.     Boart Longyear employs approximately 5,168 people and generated $657 million in revenue in 2020.  It conducts operations across North America, Latin America, Australasia and South East Asia, the Middle East, and Africa.  Nearly all of Boart Longyear's revenue derives from the following two business units: (a) drilling services within the mining and minerals industry

("Global Drilling Services") and (b) the manufacture, distribution, and sale of equipment for the mining and mineral industry ("Global Products").

### 1. Global Drilling Services

12.     Global Drilling Services provides a diverse mining customer base with drilling methods including diamond coring exploration, reverse circulation, large diameter rotary, mine dewatering, water supply drilling, pump services, production, and sonic drilling services. This division offers drilling services for commodities such as gold, copper, and nickel, as well as for the exploration and development of non-conventional energy sources such as oil shale, oil sands, coal, coal seam gas, and geothermal energy. Boart Longyear provides a range of drilling services technology, including surface and underground diamond core drilling, underground percussive drilling, sonic drilling, surface rotary drilling, surface geotechnical drilling, and surface and underground reverse circulation drilling. Global Drilling Services owns a fleet of approximately 640 drill rigs operating in 15 countries.

13.     Global Drilling Services generated $456 million in revenue for the year ending December 31, 2020, accounting for approximately 69% of Boart Longyear's total revenue.

### 2. Global Products

14.     Global Products offers sophisticated research and development and holds hundreds of patented designs to manufacture, market, and service drill rigs, drill string products, performance tooling, drilling consumables, and quality parts for customers worldwide. Boart Longyear offers these products to environmental, mining, resources, infrastructure, and energy industries. Its coring tools include conventional diamond drills and advanced wireline coring systems used in minerals drilling. Global Products sells exploration and production tooling predominantly to drilling services contractors and mining companies.

15.     In addition, a subset of Global Products—Geological Data Services—utilizes

5

innovative scanning technology and down-hole instrumentation tools to capture detailed geological data from drilled core and chip samples. This valuable orebody knowledge gives mining companies the ability to make timely decisions for more efficient exploration activities.

16.    Global Products generated approximately $201 million in revenue for the year ending on December 31, 2020, accounting for approximately 30% of Boart Longyear's total revenue.

### C.    Boart Longyear's Corporate Structure

17.    BLY, an Australian company, (a) directly owns 100% of the equity interests in the Debtors Boart Longyear Management Pty Limited ("BLY Issuer"), Votraint No. 1609 Pty Limited ("Votraint"), and Boart Longyear Investments Pty Limited ("BLI"), (b) directly owns 70.56% of the equity interests in Debtor Boart Longyear Australia Pty Limited ("BLA"), and (c) directly or indirectly owns majority equity interests in the other Boart Longyear entities.[4]

18.    The Debtors maintain personnel with oversight responsibilities for their Australian operations at 26 Butler Boulevard, Burbridge Business Park, Adelaide Airport, South Australia, which also serves as the registered offices for each of the Debtors. Boart Longyear's operations are managed on a global basis by a board of directors and executive officers conducting business out of Australia and Salt Lake City, Utah.

### D.    Boart Longyear's Capital Structure

19.    As of December 31, 2020, Boart Longyear's unaudited balance sheets reflected total assets of approximately $609 million and total liabilities of approximately $1 billion.

#### 1.    Secured Debt

20.    The Debtors' secured indebtedness consists of: (a) the Secured Notes; (b) the Term

---

[4]    A chart showing Boart Longyear's organizational structure is attached to the Pincus Declaration as **Exhibit C**.

Loan A; (c) the Term Loan B; (d) the Existing ABL; (e) the Backstop ABL; and (f) the Incremental Financing (each as defined below).

<p align="center">a.     **Secured Notes**</p>

21.     As of the Petition Date, $348,492,360.31 (face amount) was outstanding under the 12.00%/10.00% senior secured PIK toggle notes due 2022 (the "Secured Notes") under that certain indenture, dated as of September 27, 2013 (as supplemented by the first supplemental indenture dated as of August 31, 2017, the second supplemental indenture dated as of September 18, 2017, the third supplemental indenture dated as of December 31, 2018, the fourth supplemental indenture dated as of July 17, 2019, the fifth supplemental indenture dated as of June 24, 2020, the sixth supplemental indenture dated as of June 1, 2021, and as it may be further supplemented, amended, or restated from time to time, the "Secured Notes Indenture") by and among BLY Issuer, as issuer, BLY, as parent, BLA, BLI, Votraint, Boart Longyear Canada, Boart Longyear Manufacturing Canada Ltd., Longyear Canada, ULC, Boart Longyear Company, Boart Longyear Manufacturing and Distribution Inc., BL Capital Management LLC, BLY US Holdings Inc., Longyear TM, Inc., BLY IP Inc., Boart Longyear Chile Limitada, Boart Longyear S.A.C., and Boart Longyear Suisse SARL, as guarantors, and U.S. Bank National Association, as trustee and collateral agent.

22.     The Secured Notes are secured by a second-priority lien[5] on substantially all of the Debtors' real estate assets, intellectual property, equipment, and capital stock (collectively, the "Non-Working Collateral") and a fourth-priority lien on substantially all of the Debtors' accounts and payment intangibles, deposit and securities accounts, inventories, instruments, and general intangibles (collectively, the "Working Collateral").

---

[5]     Certain noteholders that did not consent to amendments to the Secured Notes Indenture effected under the sixth supplemental indenture hold a first-priority lien on the Non-Working Collateral.

### b.    Term Loan A

23.    As of the Petition Date, $160,336,984.87 (principal amount) was owing under that certain Term Loan A Securities Agreement dated as of December 31, 2018 (as amended by the First Amendment to Term Loan A Securities Agreement dated as of July 17, 2019, the Second Amendment to Term Loan A Securities Agreement dated as of June 24, 2020, the Third Amendment to Term Loan A Securities Agreement dated as of June 1, 2021, and as it may be further amended, or restated from time to time, the "Term Loan A") by and among BL Capital Management LLC (the "Term Loan Issuer"), as issuer, BLY, BLY Issuer, BLA, BLI, Votraint, Boart Longyear Canada, Boart Longyear Manufacturing Canada Ltd., Longyear Canada, ULC, Boart Longyear Company, Boart Longyear Manufacturing and Distribution Inc., BLY US Holdings Inc., Longyear TM, Inc., BLY IP Inc., Boart Longyear Chile Limitada, Boart Longyear S.A.C., and Boart Longyear Suisse SARL, as guarantors, and Wilmington Trust, National Association, as administrative agent.

24.    Obligations under the Term Loan A are secured by a third-priority lien on each of the Working Collateral and the Non-Working Collateral.

### c.    Term Loan B

25.    As of the Petition Date, $193,285,306.60 (principal amount) was owing under that certain Term Loan B Securities Agreement dated as of December 31, 2018 (as amended by the First Amendment to Term Loan B Securities Agreement dated as of July 17, 2019, the Second Amendment to Term Loan B Securities Agreement dated as of June 24, 2020, the Third Amendment to Term Loan B Securities Agreement dated as of June 1, 2021, and as it may further be amended or restated from time to time, the "Term Loan B" and, together with the Term Loan A, the "Term Loan Facilities") by and among the Term Loan Issuer, as issuer, BLY, BLY Issuer, BLA, BLI, Votraint, Boart Longyear Canada, Boart Longyear Manufacturing Canada Ltd.,

Longyear Canada, ULC, Boart Longyear Company, Boart Longyear Manufacturing and Distribution Inc., BLY US Holdings Inc., Longyear TM, Inc., BLY IP Inc., Boart Longyear Chile Limitada, Boart Longyear S.A.C., and Boart Longyear Suisse SARL, as guarantors, and Wilmington Trust, National Association, as administrative agent.

26.    Obligations under the Term Loan B are secured by liens on all of the Debtors' assets that are *pari passu* with the liens securing the Secured Notes.

### d.    The Existing ABL

27.    As of the Petition Date, $6 million (principal amount) was owing under that certain Amended and Restated Revolving Credit and Security Agreement, dated as of July 23, 2017 (as amended by the First Amendment to the Amended and Restated Revolving Credit and Security Agreement dated as of August 30, 2017, the Second Amendment to the Amended and Restated Revolving Credit and Security Agreement dated as of March 30, 2018, the Third Amendment to the Amended and Restated Revolving Credit and Security Agreement dated as of September 18, 2018, the Fourth Amendment to the Amended and Restated Revolving Credit and Security Agreement dated as of October 22, 2018, the Fifth Amendment to the Amended and Restated Revolving Credit and Security Agreement dated as of July 24, 2019, the Sixth Amendment to the Amended and Restated Revolving Credit and Security Agreement dated as of April 28, 2020, the Seventh Amendment to the Amended and Restated Revolving Credit and Security Agreement dated as of May 12, 2021, and as it may be further amended, restated, supplemented, waived, refinanced or otherwise modified from time to time, the "Existing ABL") among BLY Issuer, as borrower, BLY, BLA, BLI, Votraint, Boart Longyear Canada, Boart Longyear Manufacturing Canada Ltd., Longyear Canada, ULC, Boart Longyear Company, Boart Longyear Manufacturing and Distribution Inc., the Term Loan Issuer, BLY US Holdings Inc., Longyear TM, Inc., BLY IP Inc., Boart Longyear Chile Limitada, Boart Longyear S.A.C., and Boart Longyear Suisse SARL,

as guarantors, and PNC Bank, National Association, as lender and agent.

28.     Obligations under the Existing ABL are secured by a first-priority lien on the Working Collateral and a fifth-priority lien on the Non-Working Collateral.

29.     The Schemes do not affect the Existing ABL, and claims under the Existing ABL (the "Existing ABL Claims") will be paid in full in the ordinary course.

### e.     The Backstop ABL

30.     As of the Petition Date, approximately $62.4 million (principal amount) in principal amount was outstanding under that certain Term Loan Securities Agreement dated as of July 23, 2017 (as amended by the First Amendment to Term Loan Securities Agreement dated as of August 5, 2017, the Second Amendment to Term Loan Securities Agreement dated as of August 31, 2017, the Third Amendment to Term Loan Securities Agreement dated as of July 24, 2019, the Fourth Amendment to Term Loan Securities Agreement dated as of March 19, 2020, the Fifth Amendment to Term Loan Securities Agreement dated as of June 1, 2021, and as it may be further amended or restated from time to time, the "Backstop ABL") by and among BLY Issuer, as borrower, BLY, BLA, BLI, Votraint, Boart Longyear Canada, Boart Longyear Manufacturing Canada Ltd., Longyear Canada, ULC, Boart Longyear Company, Boart Longyear Manufacturing and Distribution Inc., the Term Loan Issuer, BLY US Holdings Inc., Longyear TM, Inc., BLY IP Inc., Boart Longyear Chile Limitada, Boart Longyear S.A.C., and Boart Longyear Suisse SARL, as guarantors, and Wilmington Trust, National Association, as administrative agent.

31.     The Backstop ABL is secured by a second-priority lien on the Working Collateral and a fourth-priority lien on the Non-Working Collateral.

32.     The Schemes do not affect the Backstop ABL, and the Backstop ABL will be fully refinanced by the Exit Financing.

### f.      The Incremental Financing

33.     As of the Petition Date, approximately $50.3 million in principal amount was outstanding under that certain Term Loan Securities Agreement, dated as of June 1, 2021 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Incremental Financing"), by and among BLY Issuer, as issuer, BLY, BLA, BLI, Votraint, Boart Longyear Canada, Boart Longyear Manufacturing Canada Ltd., Longyear Canada, ULC, Boart Longyear Company, Boart Longyear Manufacturing and Distribution Inc., the Term Loan Issuer, BLY US Holdings Inc., Longyear TM, Inc., BLY IP Inc., Boart Longyear Chile Limitada, Boart Longyear S.A.C., and Boart Longyear Suisse SARL, as guarantors, Wilmington Trust, National Association, as administrative agent, and U.S. Bank, National Association, as collateral agent, providing for the issuance of term loan securities due December 31, 2021.

34.     The Incremental Financing is secured by a first-priority lien on the Non-Working Collateral and a second-priority lien on the Working Collateral.

35.     The Schemes do not affect the Incremental Financing and contemplate that the Incremental Financing will be refinanced in full by the Exit Financing.

### 2.      Unsecured Debt

### a.      The Unsecured Notes

36.     As of the Petition Date, $93,944,522.71 (face amount) was outstanding under that certain indenture, dated as of March 28, 2011 (as supplemented by the first supplemental indenture dated as of June 14, 2013, the second supplemental indenture dated as of September 27, 2013, the third supplemental indenture dated as of April 2, 2017, the fourth supplemental indenture dated as of August 31, 2017, the fifth supplemental indenture dated as of September 18, 2017, the sixth supplemental indenture dated as of December 31, 2018, the seventh supplemental indenture dated as of July 17, 2019, the eighth supplemental indenture dated as of June 15, 2020, the ninth

supplemental indenture dated as of June 1, 2021, and as it may be further amended or restated from time to time, the "Unsecured Notes Indenture"), by and among BLY Issuer, as issuer, BLY, as parent, BLA, BLI, Votraint, Boart Longyear Canada, Boart Longyear Manufacturing Canada Ltd., Longyear Canada, ULC, Boart Longyear Company, Boart Longyear Manufacturing and Distribution Inc., the Term Loan Issuer, BLY US Holdings Inc., Longyear TM, Inc., BLY IP Inc., Boart Longyear Chile Limitada, Boart Longyear S.A.C., and Boart Longyear Suisse SARL, as guarantors, and Delaware Trust Company (as successor to U.S. Bank National Association), as trustee, providing for the issuance of 1.50% unsecured subordinated PIK notes due 2022 (the "Unsecured Notes").

### b.    Trade Debt

37.    As of the Petition Date, the Debtors estimate that they have approximately $59 million of unsecured trade debt outstanding, including accounts payable to vendors that provide key components for the construction of Boart Longyear's drilling capital equipment and specialized steel tubing critical to the construction of drill rods.  The Schemes do not affect the trade debt and contemplate that all such debt will be paid in full in the ordinary course.

### 3.    Equity Interests

38.    As of May 12, 2021, 88,511,800 shares of BLY's common stock were outstanding. BLY's common stock trades on the Australian Securities Exchange (the "ASX") under the ticker symbol "BLY."   There were also 2,012,403 quoted warrants, 43,158 options, and 427,816 unquoted warrants outstanding.

### E.    Events Preceding Commencement of the Australian Proceeding

39.    Although Boart Longyear's operations, on the whole, remain strong, a combination of adverse macroeconomic conditions that affected the commodities market for much of the past few years, and a balance sheet weighed down by the debt incurred to make investments in

equipment and other working assets when market conditions were more favorable have compelled the Debtors to seek: (a) the Australian Court's approval of the two Schemes under the Corporations Act, one to restructure the majority of their secured debt (the "Secured Creditors' Scheme"), and the other to restructure the majority of their unsecured debt (the "Unsecured Creditors' Scheme"); and (b) relief from this Court under chapter 15 of the Bankruptcy Code to prevent dissenting creditors from frustrating the purposes of Boart Longyear's restructuring, the foremost of which is to maximize value for all creditors.

### 1.    Boart Longyear's Ongoing Efforts to Deleverage

40.    Boart Longyear's financial distress has been caused primarily by the fact that it bears more debt than warranted for a mining industry player of its size.  Prior to 2012, while still in the midst of the last commodities "supercycle," Boart Longyear had invested heavily in drilling equipment and tool inventory, incurring substantial debt in the process.  Between 2010 and 2012, Boart Longyear had spent in excess of $600 million, including approximately $430 million for drilling rigs and support equipment.  As a result, by 2014, Boart Longyear's aggregate funded debt had grown to $716 million.

41.    During the past several years, Boart Longyear has taken major in- and out-of-court measures to combat its over-levered position: (a) the 2014 Recapitalization; (b) the 2017 Restructuring; and (c) the 2020 Secured Notes Restructuring.

### a.    The 2014 Recapitalization

42.    In 2014, amidst a market downturn, Boart Longyear attempted to mitigate the adverse effects of its prior investments and reduce its debt load.  The most significant of these efforts was a comprehensive recapitalization transaction announced in December 2014 (the "2014 Recapitalization").  The 2014 Recapitalization was intended to increase Boart Longyear's total liquidity to $240 million and reduce its net debt by approximately $120 million, thereby enhancing

its financial flexibility to withstand difficult operating conditions until the drilling market recovered.

43.     The 2014 Recapitalization involved: (a) an equity injection of up to $127 million, including (i) a follow-on equity placement of $21 million to Centerbridge Partners, L.P. ("Centerbridge") and (ii) equitization of $16 million of 7% unsecured notes then held by Centerbridge; and (b) the $120 million Term Loan A provided by Centerbridge and the up to $105 million Term Loan B, the proceeds of which were to be used to fund a tender offer for up to $105 million of 10% secured notes.

### b.     The 2017 Restructuring

44.     As the market downturn persisted following the 2014 Recapitalization, Boart Longyear remained overleveraged.  On April 3, 2017, Boart Longyear announced that it had entered into a restructuring support agreement with its primary stakeholders aimed at achieving a more sustainable capital structure by: (a) reducing its interest costs and overall debt; (b) improving liquidity; and (c) extending debt maturities (the "2017 Restructuring").  Boart Longyear effectuated the 2017 Restructuring through secured and unsecured Australian schemes coupled with a chapter 15 bankruptcy case in this Court (*In re Boart Longyear Limited*, Case No. 17-11156 (MEW) (Bankr. S.D.N.Y. April 27, 2017)).

45.     The 2017 Restructuring reduced Boart Longyear's funded debt by equitizing $196 million of $284 million of its 7% unsecured notes due 2021.  The remaining $88 million face amount of the 7% unsecured notes was reinstated with an interest rate of 1.5% per annum, payable in kind until maturity.

46.     The 2017 Restructuring also improved Boart Longyear's liquidity by altering interest on all its debt facilities from cash to paid-in-kind ("PIK") at Boart Longyear's election until December of 2018.  Further, the 10% senior secured notes due 2018 were exchanged for the

same principal amount of the Secured Notes due 2022, with 12% rate interest payable in kind at Boart Longyear's election until December 2018 and thereafter in cash at the reduced interest rate of 10% per annum.  Moreover, interest on the Term Loan Facilities was reduced from 12% to 10% payable-in-kind through December 2018 and 8% PIK thereafter.  In addition, Boart Longyear obtained new liquidity in the form of the Existing ABL and the Backstop ABL.

47.    Notably, the 2017 Restructuring extended the maturity dates of several of Boart Longyear's credit facilities—the Term Loan A, the Term Loan B, the Secured Notes, and the Unsecured Notes—to December 2022.

### c.    The 2020 Secured Notes Restructuring

48.     On June 19, 2020, Boart Longyear implemented certain consensual amendments to the Secured Notes Indenture that allowed it to satisfy interest payments due on the Secured Notes on June 30, 2020 and on December 31, 2020 in kind, rather than in cash.

### d.    The Restructuring Support Agreement

49.    On January 7, 2021, Boart Longyear announced the engagement of Rothschild & Co. to advise it in connection with evaluation of its options in connection with the upcoming maturities of its debt facilities in the second half of 2022.  After months of negotiations between Boart Longyear and its major stakeholders, on May 13, 2021, Boart Longyear announced that it reached an agreement, memorialized in a restructuring support agreement (the "RSA").

50.    The completion of the transactions contemplated by the RSA will substantially reduce Boart Longyear's debt, strengthen its balance sheet, lower interest expenses, and provide enhanced liquidity to support operations and future growth.  The RSA was supported by the overwhelming majority of Boart Longyear's lenders, such initial "Supporting Creditors" including certain funds and accounts managed or advised by Centerbridge, represented by Kirkland & Ellis LLP, and an ad hoc group of creditors represented by Paul, Weiss, Rifkind, Wharton & Garrison

LLP (the "AHG").[6]

51.     More specifically, Boart Longyear's total debt would decrease to less than $200 million, with approximately $795 million, approximately 85%, being converted to equity interests in reorganized BLY.  BLY's existing shareholders will be given an opportunity to purchase additional equity in reorganized BLY alongside BLY's creditors.  Among other things, the parties to the RSA have agreed to distribute the New Common Equity based upon the following stipulated amounts and allocations:

- For claims arising out of Term Loan A (the "Term Loan A Claims"): pro rata shares of New Common Equity, calculated based on (i) 100% of the secured portion of the Term Loan A Claims of $85,000,000 (the "TLA Secured Equity Entitlement") and (ii) 25% of the unsecured portion of the Term Loan A Claims of $75,336,984.87 (the "TLA Unsecured Equity Entitlement");

- For claims arising out of Term Loan B (the "Term Loan B Claims"): pro rata shares of New Common Equity, calculated based on (i) 100% of the secured portion of the Term Loan B Claims of $105,000,000 (the "TLB Secured Equity Entitlement") and (ii) 25% of the unsecured portion of the Term Loan B Claims of $88,285,306.60 (the "TLB Unsecured Equity Entitlement");

- For claims arising out of the Secured Notes (the "Secured Notes Claims"): pro rata shares of New Common Equity, calculated based on (i) 100% of the secured portion of the Secured Notes Claims of $303,567,773.87 (the "SSN Secured Equity Entitlement") and (ii) 25% of the unsecured portion of the Secured Notes Claims of $44,924,586.44 (the "SSN Unsecured Equity Entitlement"); and

- For claims arising out of the Unsecured Notes ("Unsecured Notes Claims"): pro rata shares of New Common Equity, calculated based on 22.5% of the Unsecured Notes Claims of $93,944,522.71 (the "SUN Equity Entitlement").

---

[6]    The members of the AHG at the time of the RSA execution include Ascribe Capital LLC, Corre Partners Management, LLC, First Pacific Advisors, LP, Nut Tree Capital Management, LP, Ares Management LLC, and HPS Investment Partners, LLC, as applicable.

## 2. The COVID-19 Pandemic

52.     The exploration, mining, and construction markets were materially impacted by the COVID-19 pandemic in 2020, and Boart Longyear was not immune to such market pressures. Boart Longyear saw a decline in global customer activities due to government-imposed closures and customers choosing to reduce exposure across their operations by delaying new projects.

53.     In response, Boart Longyear implemented a business continuity plan in March of 2020 to combat the unique challenges posed by the pandemic.  That plan included: (a) measures required to protect the health and well-being of employees while ensuring ongoing operational sustainability; (b) transitioning of corporate and regional office staff to work from home; and (c) ceasing all non-essential international and domestic travel.  Other cash conservation measures Boart Longyear implemented included instituting temporary salary reductions and the 2020 Secured Notes Restructuring.

54.      Where possible, Boart Longyear sustained operations by working with key customers while ensuring the protection of Boart Longyear employees and the communities in which they work.  Further, Boart Longyear demonstrated best practice in its active and consistent implementation of health and safety protocols.  This significantly reduced the risk of unplanned stoppages or delays due to COVID-19 outbreaks, allowing Boart Longyear to continue to deliver results for customers under exceptional circumstances.

55.     Despite such efforts, Boart Longyear saw a significant disruption in operations from 2019 to 2020, with revenue falling 11.8% from $745 million in 2019 down to $657.3 million in 2020.

56.     As the pandemic has subsided, Boart Longyear has responded to a material increase in commodity pricing and underlying demand.  In addition, the recovery of China's economy has driven demand for the key bulk of commodities of copper, iron ore, and nickel.  Meanwhile, gold

prices have held well above the sustaining costs for major mines. Looking forward, the electrification of vehicle fleets and conversion to green energy further support the prospects for sustained growth in copper, nickel, and lithium exploration and production over the coming years. Already, the first quarter of 2021 saw revenues increase 22% compared to the prior year, representing the strongest first quarter since 2014.

### 3.    Debtors' Property in the United States

57.    Each of the Debtors has an undivided interest in a $250,000 retainer in favor of Milbank LLP, counsel to the Foreign Representative, deposited in a client trust account located in New York, New York (the "Retainer Account").[7]

58.    Moreover, as set forth above, each of the Secured Notes Indenture, Unsecured Notes Indenture, and the Term Loan Facilities is governed by New York law and contains a New York forum selection provision.[8]

### THE RESTRUCTURING

### A.    Australian Schemes of Arrangement, Generally

59.    Part 5.1 of the Corporations Act provides for the approval by an Australian court of competent jurisdiction of a scheme of arrangement between a "Part 5.1 body" (which includes a company incorporated under the Corporations Act) and its creditors (or any class of them).[9]

60.    The procedures provided for in Part 5.1 of the Corporations Act are substantially similar to the provisions of part 26 of the Companies Act 2006 of England and Wales, which

---

[7]    Pincus Decl. at ¶ 53.

[8]    *Id.* at ¶ 54. Relevant portions of: (a) the Secured Notes Indenture are attached to the Pincus Decl. as **Exhibit D**; (b) the Unsecured Notes Indenture are attached to the Pincus Decl. as **Exhibit E**; (c) the Third Amended and Restated Term Loan A Securities Agreement are attached to the Pincus Decl. as **Exhibit F**; and (d) the Third Amended and Restated Term Loan B Securities Agreement are attached to the Pincus Decl. as **Exhibit G**.

[9]    Marshall Decl. at ¶ 7.

governs schemes of arrangement in the U.K.[10]

61.    Once agreed to at a meeting of creditors (or at a meeting of the relevant class(es) of creditors) by the requisite majorities, and then approved by an Australian court of competent jurisdiction (such as the Australian Court),[11] a scheme of arrangement takes effect upon lodgment of an Australian court's orders approving the scheme with the Australian Securities and Investments Commission ("ASIC").  Upon satisfaction of all conditions precedent to the scheme of arrangement, the scheme binds all of the creditors (or the relevant class(es) of creditors) who were eligible to vote on the scheme, and gives legal effect to the proposed compromise or arrangement implementing the restructuring among the debtor company and its creditors that are the subject of the scheme of arrangement.[12]

62.    Like a chapter 11 plan, a central purpose of a creditors' scheme of arrangement is to provide a company with a mechanism to overcome the impossibility or impracticability of obtaining the individual consent of every member of the class or classes of creditors intended to be bound by the proposed arrangement (the "Scheme Creditors" and their claims proposed to be so affected, the "Scheme Claims").[13]

63.    Subject to the satisfaction of any conditions precedent to a particular scheme of arrangement, the receipt of court approval, and lodgment with ASIC, a scheme of arrangement will become binding if it is agreed to by the creditors in each class by the requisite majorities.  A class of Scheme Creditors agrees to the scheme of arrangement if the scheme is agreed to by creditors voting in that class at the scheme meeting that comprise: (a) a majority in number of the

---

[10]    *Id.* at ¶ 8.

[11]    *Id*. at ¶ 11.

[12]    *Id.*

[13]    *Id.* at ¶ 9.

creditors of that class who vote at that meeting; and (b) at least 75% of the amount of claims in that class held by those voting at that meeting.[14]

64.     If the proposed scheme is agreed to by the relevant class(es) of creditors, the proponent company will seek an order from an Australian court approving the scheme of arrangement at a second hearing.[15]

65.     Before approving a scheme of arrangement, the Australian court will consider a number of factors, including whether:

- the applicable statutory requirements are met;
- creditors voted in good faith and not for an improper purpose;
- the proposal is fair and reasonable, taking into account the interests of the creditors and the scheme's impact on dissenting creditors, if any;
- the debtor company has properly disclosed all information relevant to the creditors' decision and the Australian court's exercise of its discretion;
- minority equity holders would be oppressed by the proposed scheme; and
- the proposed scheme is contrary to public policy.[16]

*Id.*

66.     If, after evaluating the foregoing factors, the Australian court is satisfied with the terms of the proposed scheme of arrangement, the Australian court will enter an order approving the scheme and authorizing lodgment of the order with ASIC.  Once the order is lodged with ASIC, and subject to satisfaction of any of the scheme's conditions precedent, the scheme will become effective and binding on all of the class(es) of creditors who were eligible to vote on the scheme.[17]

**B.     Status of the Schemes**

67.     On July 22, 2021, the Debtors filed in the Australian Court an application seeking,

---

[14]   *Id.* at ¶ 10.

[15]   *Id.* at ¶ 18.

[16]   *Id*. at ¶ 42.

[17]   *Id.* at ¶ 43.

among other things, orders: (a) convening meetings to consider the two schemes of arrangement proposed by the Debtors to be made with certain of their secured and unsecured creditors (the "Scheme Meetings"); and (b) approving the Schemes.[18]  As part of such application, the Debtors filed a draft explanatory statement (the "Explanatory Statement") together with copies of the proposed Schemes.  These documents are, respectively, in the nature of a disclosure statement and plan of reorganization in a chapter 11 case.[19]  The Debtors also filed various documents designed to implement the terms of the Schemes, such as credit, security, and shareholder-related documents (collectively with the Schemes and the Explanatory Statement, the "Restructuring Documents"). *Id.*  These documents are comparable to the documents typically contained in a plan supplement filed in a chapter 11 case.[20]

68.    The first hearing with respect to the Schemes (the "First Court Hearing") took place before the Australian Court on July 27, 2021 and July 29, 2021.  On July 29, 2021, the Australian Court entered orders (the "Convening Orders") to, among other things, convene the Scheme Meeting on August 31, 2021, at 10:30 a.m. (Australian Eastern Standard Time) in respect of the Secured Creditors' Scheme and 11:30 a.m. (Australian Eastern Standard time) in respect of the Unsecured Creditors' Scheme. [21]

69.    The Australian Court will hold a second hearing (the "Second Court Hearing") on September 16, 2021, at 9:15 a.m. to consider the results of the Scheme Meetings.[22]  Notices of the

---

[18]    *Id.* at ¶ 47.

[19]    *Id.* at ¶ 48.

[20]    *Id.*  A copy of (a) the draft Explanatory Statement (without annexes) is attached to the Marshall Declaration as **Exhibit B**; (b) the proposed Schemes (without annexes) are attached to the Marshall Declaration as **Exhibit C**; and (c) the Application filed with the Australian Court is attached to the Marshall Declaration as **Exhibit D**.

[21]    *Id*. at ¶ 50.

[22]    *Id*.

Scheme Meetings, together with the Explanatory Statement, the proposed Schemes, and proxy and election forms (together with guidance notes for the completion of the voting form) will be made available to the Scheme Creditors.[23]

70.     The Schemes address the claims of five classes of claims: (a) claims on account of the Secured Notes (the "Secured Notes Claims"); (b) claims on account of Term Loan A (the "Term Loan A Claims"); (c) claims on account of Term Loan B (the "Term Loan B Claims"); (d) claims on account of Unsecured Notes (the "Unsecured Notes Claims"); and (e) the holders of subordinate claims (*i.e.*, claims arising from the buying, holding, selling or otherwise dealing in shares in BLY).[24] If the Unsecured Creditors' Scheme is implemented, the right and entitlement of the holders of subordinate claims to enforce those claims against BLY will be limited, both by statute and the terms of the Unsecured Creditors' Scheme, to the amount (if any) actually recovered by BLY under an applicable policy of insurance, net of expenses.[25]

71.     The Scheme Creditors may attend the applicable Scheme Meeting and cast their votes or return the voting and proxy forms to the Debtors or their agent, which will thereafter tabulate the votes and make available a voting report. The Debtors must also provide ASIC with the results of voting held at the Scheme Meetings and seek to obtain a written statement from ASIC that it has no objection to the Schemes.[26]

72.     If deemed appropriate, on or after the Second Court Hearing, the Australian Court will enter an order approving the Schemes (the "Sanction Order"). The Sanction Order will become effective on the date it is registered with the Debtors' corporate regulator, ASIC, which is

---

[23]   *See id.* at ¶¶ 36-37.

[24]   *Id.* at ¶ 54.

[25]   *Id.*

[26]   *Id.* at ¶ 51.

expected to occur on or around September 17, 2021 (the "Schemes Effective Date").  The Schemes

will be deemed implemented once all the transactions contemplated therein are consummated (the

"Schemes Implementation Date"), including by the terms set forth in various implementation

deeds, including the restructuring implementation deed (collectively, the "Implementation

Deeds").  The Scheme Implementation Date is currently anticipated to be on or around September

23, 2021.

### C.    Description of the Schemes

#### 1.    Summary of the Terms

73.    The primary objectives of the Debtors' restructuring are to modify their capital

structure to reduce materially their debt load, obtain new sources of liquidity, and extend the

maturities of their existing funded debt obligations, all as summarized below: [27]

| | |
|---|---|
| **Existing ABL** | Unless refinanced in full by the Exit Financing, the Existing ABL will remain in place, subject to maturity extension and any other consensual modifications to be negotiated with lenders.  The proceeds from the Creditor Share Purchase Option and the Share Purchase Plan shall be applied to pay down the balance owing under the Existing ABL (to the extent that the Existing ABL is not fully refinanced by the Exit Financing). |
| **Backstop ABL** | The Backstop ABL will be fully repaid or refinanced by the Exit Financing. |
| **Incremental Financing** | The Incremental Financial will be fully repaid or refinanced by the Exit Financing. |

---

[27]    This summary is provided for reference purposes only. The Court is respectfully referred to the Explanatory Statement attached to the Marshall Declaration as **Exhibit B** for a more detailed account of the terms of the Schemes, with the Explanatory Statement controlling in the event of any conflict between this summary and the account set forth in the Explanatory Statement. Capitalized terms not otherwise defined in the following summary have the meanings ascribed to them in the Explanatory Statement.

| | |
|---|---|
| **Term Loan A** | Each holder of claims under Term Loan A will receive:<br><br>• Pro rata share of the TLA Secured Equity Entitlement;<br>• Pro rata share of the TLA Unsecured Equity Entitlement; and<br>• Allocation, if any, of shares of common equity available under the Creditor Share Purchase Option. |
| **Term Loan B** | Each holder of claims under Term Loan B will receive:<br><br>• Pro rata share of the TLB Secured Equity Entitlement;<br>• Pro rata share of the TLB Unsecured Equity Entitlement; and<br>• Allocation, if any, of shares of common equity available under the Creditor Share Purchase Option. |
| **Secured Notes** | Each holder of claims under Secured Notes will receive:<br><br>• Pro rata share of the SSN Secured Equity Entitlement;<br>• Pro rata share of the SSN Unsecured Equity Entitlement; and<br>• Allocation, if any, of shares of common equity available under the Creditor Share Purchase Option. |
| **Unsecured Notes** | Each holder of claims under Unsecured Notes will receive:<br><br>• Pro rata share of the SUN Equity Entitlement;<br>• Pro rata share of the New Warrants (see below), calculated based upon 100% of the face amount of the Unsecured Notes Claim; and<br>• Allocation, if any, of shares of common equity available under the Creditor Share Purchase Option. |
| **General Unsecured Claims** | General unsecured claims will not be impaired and will continue to be paid in the ordinary course of business. |
| **Intercompany Claims and Interests** | Intercompany claims and interests will not be impaired by the Restructuring. |
| **Existing Common Shares** | Each holder of existing common shares will retain pro rata shares of the 1.5% of any shares of common equity in reorganized BLY remaining after the issuance of the New Common Equity.<br><br>Certain holders of existing common shares (the "Non-Associated Shareholders") have the right to participate in the Share Purchase Plan (as defined below). |
| **Existing Warrants and Options to Purchase Common Shares** | Each holder of existing warrants or options to purchase common shares in BLY will retain those warrants or options, in all cases subject to dilution. Such existing warrants and options may be subject of an Assumption Deed if the Redomiciliation is implemented. |

| | |
|---|---|
| **Creditor Share Purchase Option** | Under the Creditor Share Purchase Option, and subject to an aggregate cap of $2.5 million plus any undersubscription under the Share Purchase Plan:<br><br>• Each holder of Unsecured Notes will be offered the right to purchase equity interests in reorganized BLY remaining after issuance of the New Common Equity in accordance with the terms of the Schemes.<br>• If the Creditor Share Purchase Option is undersubscribed, the remaining shares will be offered to the holders of the Term Loan A, Term Loan B, and Secured Notes. |
| **New Warrants** | Holders of Unsecured Notes will receive New Warrants which confer the right to purchase up to 10% of the total common shares of BLY outstanding immediately upon implementation of the Schemes (after giving effect to the exercise of the New Warrants) (pre-dilution for any shares to be issued under the Share Purchase Plan, the Creditor Share Purchase Option and any management incentive plan)—being a total number of New Warrants of 32,782,148—with a strike price per share that corresponds to an overall recovery to the holders of Secured Notes Claims on account of their Secured Notes Claims (excluding Secured Notes Claims relating to the Applicable Premium), including all accrued and unpaid interest, of 115.0%, an exercise period not exceeding the sixth anniversary of the date of issue of the New Warrants, and on terms that do not prohibit or restrict BLY in any way from paying any dividends or making any other distributions (including of shares or any other securities or property). |
| **Share Buyback** | Subject to shareholder approval of the members' scheme of arrangement approving the Redomiciliation, small shareholders will have the opportunity, under certain conditions, to sell back their parcels of BLY shares should they choose not to retain their holdings moving forward. The company will offer up to US$500,000 to purchase small parcels of existing common shares worth less than AUD$3,000 from Non-Associated Shareholders on terms and pricing to be determined by BLY. |
| **Share Purchase Plan** | The Non-Associated Shareholders have the right to purchase common shares in reorganized BLY, subject to an aggregate maximum cap of $2.5 million (the "<u>Share Purchase Plan</u>"). |
| **Releases and Exculpation** | The Debtors and all of their affiliates that are liable with them with respect to the debts that are being released, waived, reduced or modified by the Schemes (including U.S.-based affiliates) will be granted releases with respect to all such released, waived, reduced or modified debts. |

| | |
|---|---|
| **Governance** | The initial and subsequent post-restructuring board of directors of BLY will be comprised of 9 directors, of which at least two will be Australian residents, and will include:<br>• The Chief Executive Officer;<br>• 5 directors nominated by Centerbridge; and<br>• 3 directors nominated by the AHG. |
| **Redomiciliation** | BLY will take all steps necessary to redomicile its corporate and tax domicile to Canada. The Redomiciliation will be implemented through a members' scheme of arrangement. The members' scheme of arrangement is subject to court and shareholder approval. |
| **Exit Financing** | New money loan of $115,000,000 to fully refinance the Backstop ABL, the Incremental Financing, and, if determined commercially reasonable by Boart Longyear and key creditors, the amount needed to fully refinance the Existing ABL. |

74.    As set forth below, the proposed restructuring enjoys the support of the Debtors' stakeholders holding substantial percentages of their secured and unsecured debt:[28]

| | Secured Notes | Term Loan A | Term Loan B | Unsecured Notes |
|---|---|---|---|---|
| Holdings of Supporting Creditors | $347,205,779.75 | $160,336,984.87 | $193,285,306.60 | $88,294,296.80 |
| % of Total | 99.6% | 100% | 100% | 94% |

### 2.    The Releases

75.    Under the Schemes, the Scheme Creditors, as well as certain other non-Debtor parties, will grant a release of: (a) Scheme Claims against the Debtors and certain of their non-Debtor affiliates in their respective roles as issuers, borrowers, or guarantors of Scheme Claims arising between the date of the relevant document and the date on which the relevant Scheme is implemented; (b) claims against any past or present director or officer of the Debtors who signs a deed poll relating to any fact, matter, or circumstance that arose or occurred in respect of, or in

---

[28]    These numbers are as of May 12, 2021 and include accrued/accredited interest at the current rates. The Term Loan Facilities amounts are net of the amounts paid by Boart Longyear on account of the Australian withholding tax.

connection with a Debtor between the date on which the relevant finance document was entered into and the date on which the relevant Scheme is implemented; and (c) certain categories of claims the Scheme Creditors have against one another (if any) (collectively, the "Releases" and the parties released thereby, collectively, the "Released Parties").[29]

76.     Claims involving fraud, willful misconduct, recklessness, gross negligence, or dishonesty are carved out from the Releases.

## RELIEF REQUESTED

77.     The Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**:

A.     recognizing the Australian Proceeding as a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code, and granting all of the relief afforded to such proceedings pursuant to section 1517 of the Bankruptcy Code;

B.     recognizing the Foreign Representative as the duly authorized "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code for all purposes in the Chapter 15 Cases and otherwise;

C.     granting all relief automatically and as of right available to the Debtors and the Debtors' property (including all intangible property) that is now or in the future located within the territorial jurisdiction of the United State under section 1520(a) of the Bankruptcy Code upon the recognition of the Australian Proceeding as a foreign main proceeding, including, without limitation, application of section 362 of the Bankruptcy Code; and

D.     to the extent not granted automatically and as of right upon recognition of the Australian Proceeding as a foreign main proceeding pursuant to section 1520(a) of the Bankruptcy Code, granting certain additional relief pursuant to sections 105(a), 1507, 1521, and 1525 of the Bankruptcy Code (collectively, the "Additional Relief"), including:

1.     granting comity, and giving full force and effect to the Australian Proceeding, the Convening Orders, the Schemes (including the Implementation Deeds) and, once entered by the Australian Court, the Sanction Order; and

2.     an injunction prohibiting all persons and entities subject to the jurisdiction

---

[29]   The Releases are set forth in Secured Creditors' Scheme § 10.1(a)(i)(B) attached as **Exhibit C** to the Marshall Declaration.

of the United States from taking any action inconsistent with, or interfering with the enforcement and implementation of, the Australian Proceeding, the Convening Orders, the Schemes (including the Implementation Deeds), and, once entered by the Australian Court, the Sanction Order, including, without limitation:

a.    taking any of the following actions on account of any Scheme Claim:

> (i)    taking or continuing any act to obtain possession of, or exercise control over, including but not limited to, attaching, repossessing, seizing, or disposing of, as applicable, any of the Debtors' or Released Parties' tangible or intangible property, including any proceeds thereof, that is located within the territorial jurisdiction of the United States (collectively, the "Applicable Property");

> (ii)    commencing, continuing, or enforcing any action or legal proceeding within the territorial jurisdiction of the United States (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever), including by way of counterclaim (each, an "Action") against the Debtors, the Released Parties, or any of the Applicable Property; or

> (iii)    commencing or continuing any act or Action to create, perfect or enforce any lien, setoff or claim (including a contract claim) against the Debtors, the Released Parties, or the Applicable Property; provided, however, that no action described in sections 555, 556, 557, 559, 560, 561, 562 and 1519(d) and (f) of the Bankruptcy Code will be enjoined by such injunction.

b.    commencing any Action in the territorial jurisdiction of the United States against the Debtors, the Foreign Representative, the Released Parties, or any of their respective successors, directors, officers, agents, employees, representatives, advisors, or attorneys in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken in connection with the Chapter 15 Cases, the Schemes (including the Implementation Deeds), the Convening Orders, or the Sanction Order, or to resolve any dispute arising out of the Schemes (including the Implementation Deeds), the Convening Orders, or the Sanction Order; or

c.    declaring or considering the filing of the Australian Proceeding or the Chapter 15 Cases a default or event of default under any agreement, contract or arrangement.

78.    The relief requested herein is without prejudice to the Foreign Representative's

right to request any additional relief, including recognition and enforcement of any order of the Australian Court, including the Sanction Order, if and when entered.

## **BASIS FOR RELIEF**

79.     The Foreign Representative seeks to implement the terms of the Schemes and, once entered by the Australian Court, the Sanction Order to the greatest extent possible to ensure the success of the Debtors' restructuring.  To achieve that result, the Schemes and the Sanction Order must be binding and enforceable in the United States and the dissenting Scheme Creditors, if any, must be precluded from taking any actions in the United States that may frustrate the restructuring effectuated in the Australian Proceeding.

80.     For the reasons set forth below, the relief sought is appropriate under chapter 15 of the Bankruptcy Code and should be approved.

**A.     The Debtors Are Eligible to Be "Debtors" In a Case Under Chapter 15 of the Bankruptcy Code.**

**1.     The Debtors Satisfy the Requirements of Section 109(a) Because They Hold Property In the United States.**

81.      A debtor that is the subject of a foreign proceeding "must meet the requirements of Section 109(a) before a bankruptcy court may grant recognition of the foreign proceeding." *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013).  Section 109(a) requires that a debtor must either reside, have a domicile, a place of business, or property in the United States.  11 U.S.C. § 109(a).

82.     "As a general matter, courts that have construed the 'property' requirement in Section 109 with respect to foreign corporations and individuals have found the eligibility requirement satisfied by even a minimal amount of property located in the United States."  *In re B.C.I. Finances Pty Ltd.*, 583 B.R. 288, 294 (Bankr. S.D.N.Y. 2018) (citing cases) (citation and

29

internal quotation marks omitted).[30] "Bank accounts, attorney retainers deposited in [the United States], or causes of action owned by the foreign debtor with a situs in [the United States] have satisfied the 'property in the United States' eligibility requirement." *In re Foreign Econ. Indus. Bank Ltd., "Vneshprombank" Ltd.*, 607 B.R. 160, 172 (Bankr. S.D.N.Y. 2019); *see, e.g.*, *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372-73 (Bankr. S.D.N.Y. 2014) (holding that cash in an account maintained by U.S. counsel to the foreign representative satisfied section 109(a) requirement).

83.      The situs of intangible property depends upon a "common sense appraisal of the requirements of justice and convenience in the particular circumstance at issue." *Octaviar Admin. Pty Ltd*, 511 B.R. at 371 (citation and internal quotation marks omitted). For instance, a "debtor's contract rights are intangible property of the debtor" that "can be and typically are tied to the location of the governing law of the contract." *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 699 (Bankr. S.D.N.Y. 2017) (citation omitted). "Accordingly, debt subject to a New York governing law clause and a New York forum selection clause constitutes property in the United States." *Id.*

84.      As described above, each of the Debtors is either an issuer, borrower, or guarantor under the Secured Notes Indenture, the Unsecured Notes Indenture, and the Term Loan Facilities. Each of these instruments is governed by New York law and contains a New York forum selection provision. Moreover, each Debtor has an undivided interest in the Retainer Account.[31]

---

[30]    *See also GMAM Invs. Funds Trust I v. Globo Comunicações e Participações S.A. (In re Globo Comunicações e Participações S.A.)*, 317 B.R. 235, 249 (S.D.N.Y. 2004) ("For a foreign corporation to qualify as a debtor under Section 109, courts have required only nominal amounts of property to be located in the United States, and have noted that there is virtually no formal barrier to having federal courts adjudicate foreign debtors' bankruptcy proceedings."); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) ("[T]here is no statutory requirement as to the property's minimum value."); *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 200 (Bankr. D. Del. 2015) ("Courts construing the 'property' requirement of § 109(a) to foreign corporations and individuals have determined that the eligibility requirement is satisfied by even a minimal amount of property located in the United States.").

[31]    Pincus Decl. at ¶¶ 53-54.

85.     Thus, each Debtor holds property in the United States, satisfying section 109(a) of the Bankruptcy Code.

> **2.      The Debtors Are Subject to the Australian Proceeding, Which Satisfies the Requirements of a "Foreign Proceeding."**

86.     To qualify as a chapter 15 debtor, the entity must also be "the subject of a foreign proceeding."   11 U.S.C. § 1502(1).   A "foreign proceeding" is a "collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).   The Australian Proceeding satisfies each of these criteria.

87.     *First*, the Australian Proceeding is an ongoing judicial proceeding in a foreign country: the Debtors filed the Australian Proceeding on July 22, 2021 in Australia and it is being administered by the Australian Court.[32]

88.     *Second*, the Australian Proceeding is collective in nature.  "The main test of whether a proceeding is collective is whether all creditors' interests were considered in the proceeding."  *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 140 (S.D.N.Y. 2012).  By contrast, a non-collective proceeding is one "instigated at the request, and for the benefit, of a single secured creditor," such as a receivership.  *In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev. 2009).  The Australian Proceeding involves all the of Scheme Creditors and requires approval by a majority in number of the voting (whether in person or by proxy) Scheme Creditors in each class representing at least 75% of the total amount of claims in each class.[33]   Thus, the Australian Proceeding is collective in nature.

---

[32]   Marshall Decl. at ¶ 47.

[33]   *Id*. at ¶ 10.

89.     *Third*, the Australian Proceeding is being conducted under Part 5.1 of the Corporations Act, an Australian law that governs, among other things, corporate restructuring and insolvency, reorganizations, and schemes of arrangement or compromise.[34]  Thus, the Australian Proceeding is being conducted under a law related to insolvency or the adjustment of debts.  The Australian Proceeding establishes formalities in accordance with the Corporations Act that set consistent expectations for the Scheme Creditors.

90.     *Fourth*, the Debtors' assets and affairs are subject to the control and supervision of the Australian Court.  Among other things, the Australian Court has entered the Convening Orders to facilitate the approval of the Schemes, and the Schemes will ultimately require approval by the Australian Court to be effective.[35]

91.     *Finally*, the Australian Proceeding was commenced by the Debtors for the purpose of reorganization.  The Schemes will accomplish a balance sheet restructuring of the Debtors' funded debt obligations and are a crucial component of the overall restructuring of Boart Longyear.

92.     Therefore, the Australian Proceeding is a foreign proceeding.

93.     Indeed, bankruptcy courts in this and other districts have routinely granted recognition to Australian schemes of arrangement as "foreign proceedings."  *See, e.g., In re Virgin Australia Holdings Ltd.*, No. 20-11024 (SHL) (Bankr. S.D.N.Y. May 22, 2020); *In re Quintis Ltd.*, No. 18-12739 (MG) (Bankr. S.D.N.Y. Oct. 11, 2018); *In re Boart Longyear, Ltd.,* No. 17-11156 (MEW) (Bankr. S.D.N.Y. May 22, 2017); *In re Emeco Holdings Limited*, No. 16-13080 (MKV) (Bankr. S.D.N.Y. March 9, 2017).

---

[34]    *Id.* at ¶ 47.

[35]    *Id.* at ¶ 43.

**B.**     **The Court Should Recognize the Australian Proceeding as a "Foreign Main Proceeding."**

94.     Section 1517(a) of the Bankruptcy Code provides that, subject to section 1506 of the Bankruptcy Code, a court "shall" enter an order granting recognition of a foreign proceeding if: (a) such foreign proceeding is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code; (b) "the foreign representative applying for recognition is a person or body" who is "authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding;" and (c) "the petition meets the requirements of section 1515 of the Bankruptcy Code." 11 U.S.C. §§ 101(24), 1517(a).

95.     All of the requirements for recognition of the Australian Proceeding as a foreign main proceeding are satisfied.

**1.**     **The Australian Proceeding is a "Foreign Main Proceeding" Because the Debtors' COMI is Located in Australia.**

96.     A "foreign main proceeding" is "a foreign proceeding pending in the country where a debtor has the center of its main interests." 11 U.S.C. § 1502(4). "The relevant principle [to determine a debtor's center of main interests ("COMI")] is that the COMI lies where the Debtor conducts its regular business, so that the place is ascertainable" by third parties. *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 130 (2d Cir. 2013). "Among other factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." *Id.* The "flexibility inherent in chapter 15 strongly suggests, however, that the Court should not apply such factors mechanically." *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007). "Instead, they should be viewed in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's

value." *Id.*  The relevant time period to consider in determining the location of a debtor's COMI is the date on which the chapter 15 petition is filed.  *Fairfield Sentry*, 714 F.3d at 137.

97.     "In the absence of evidence to the contrary, the debtor's registered office" is "presumed to be the center of the debtor's main interests."  11 U.S.C. § 1516(c); *see In re Tri-Continental Exch.*, 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006) ("[T]he registered office. . . is evidence that is probative of, and that may in the absence of other evidence be accepted as proxy for, 'center of main interest.'").

98.     Each of the Debtors has its registered offices in Adelaide Airport, South Australia.[36] Accordingly, each of the Debtors is entitled to the statutory presumption that Australia is its COMI.

99.     Furthermore, BLY is subject to Australian law for most corporate governance and transactional purposes because it is a public company registered in Australia and listed on the ASX.[37]  Moreover, because all of the public filings mandated by its listing on the ASX indicate BLY's Australian nexus, the Debtors' COMI in Australia has been easily ascertainable by creditors and other third parties.  Thus, Australia is the Debtors' COMI, and the Australian Proceeding should be recognized as a "foreign main proceeding."

## 2.     The Foreign Representative Qualifies As a "Foreign Representative."

100.     The foreign representative applying for recognition of a foreign proceeding must be "a person or body."  11 U.S.C. § 1517(a)(2).  Section 101(24) of the Bankruptcy Code further explains that such "person or body" must be "authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."  11 U.S.C. § 101(24).  "If the decision [commencing the foreign

---

[36]   Pincus Declaration at ¶ 17.

[37]   *Id.* at ¶ 60.

proceeding] . . . indicates that . . . the person or body is a foreign representative, the court is entitled

to so presume." 11 U.S.C. § 1516(a).  In addition, where the applicable foreign law allows a debtor

to act as a debtor in possession and manage its own affairs, the debtor itself can provide the

applicable authorization.  *See generally Ad Hoc Grp. of Vitro Noteholders v. Vitro S.A.B. de C.V.*

*(In re Vitro S.A.B. de C.V.)*, 701 F.3d 1031 (5th Cir. 2012); *see also In re OAS S.A.*, 533 B.R. 83

(Bankr. S.D.N.Y. 2015) (foreign representative authorized by Brazilian equivalent of a debtor-in-

possession met definition of "foreign representative" for purposes of chapter 15); *In re Compañía*

*Mexicana De Aviación, S.A. de C.V.*, 2010 Bankr. LEXIS 6538 (Bankr. S.D.N.Y. Nov. 8, 2010)

(foreign representative authorized by Mexican equivalent of a debtor-in-possession met definition

of "foreign representative" for purposes of chapter 15).

101.    The Australian Court recognized the Foreign Representative as the "foreign

representative" of each Debtor for the purposes of the Chapter 15 Cases on July 29, 2021.[38]

102.    Moreover, BLY's board of directors specifically authorized the Foreign

Representative to commence the Chapter 15 Cases and to serve as the Debtors' "foreign

representative" by written resolution.[39]

103.    Thus, the Foreign Representative qualifies as the Debtors' foreign representative.

**3.      The Verified Petition Satisfies Requirements of Section 1515 of the
Bankruptcy Code and Bankruptcy Rule 1007(a)(4).**

104.    Section 1505 of the Bankruptcy Code requires that the application for recognition

of a foreign proceeding be accompanied by:

---

[38]   Pincus Decl. at ¶ 3.  A copy of the order authorizing the Foreign Representative to serve as each Debtor's foreign
representative for the purpose of commencing the Chapter 15 Cases is attached to the Pincus Declaration as
**Exhibit B**.

[39]   *Id*.  A copy of the written resolution of BLY's board of directors is attached to the Pincus Declaration as
**Exhibit A**.

A.      a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

B.      a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative;

C.      in the absence of evidence referred to in paragraphs (A) and (B), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative; and

D.      a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

11 U.S.C. § 1515(b)–(c).

105.    In addition, Bankruptcy Rule 1007(a)(4) requires that a chapter 15 petition be accompanied with:

A.      a corporate ownership statement containing information described in Bankruptcy Rule 7007.1; and

B.      a list containing:

1.      the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor;

2.      all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition; and

3.      all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code.

Fed. R. Bankr. P. 1007(a)(4).

106.    The Foreign Representative has duly filed the Petition, the supporting declarations, as well as all of the foregoing information, accompanied by all requisite fees.  Specifically, the Foreign Representive has filed: (a) a corporate ownership statement containing the information required in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer the Debtors' foreign proceedings, (ii) all parties to litigation pending in the United States in which any of the Debtors are party at the time of the filing of the

Chapter 15 Cases, and (iii) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all foreign proceedings with respect to the Debtors that are known to the Foreign Representative; and (d) certified copies of the Convening Orders.  The Court is entitled to presume the authenticity of all such documents (11 U.S.C. § 1516(b)), and no evidence rebutting such presumption has been submitted by any party.

107.    Accordingly, the requirements of section 1515 of the Bankruptcy Code and of Bankruptcy Rule 1007(a)(4) have been satisfied.

**C.    The Debtors Are Entitled to the Relief Granted Automatically Under Section 1520 of the Bankruptcy Code.**

108.    Upon recognition of a foreign main proceeding, a foreign debtor is automatically entitled to certain statutory relief.  11 U.S.C. § 1520(a).  Among other things, this relief includes the protections afforded by the automatic stay under section 362 of the Bankruptcy Code to both the Debtors and their property located within the territorial jurisdiction of the United States.  11 U.S.C. § 1520(a)(1).

109.    To the extent the Court recognizes the Australian Proceeding as a foreign main proceeding, the Foreign Representative respectfully submits that no further showing is required for the Debtors and their property to benefit from the protections set forth in section 1520(a) of the Bankruptcy Code.

**D.    Additional Relief is Necessary to Effectuate the Purpose of Chapter 15 and Protect the Debtors' and Creditors' Interests.**

110.    The Foreign Representative is also seeking certain Additional Relief pursuant to sections 105(a), 1507, 1521, and 1525 of the Bankruptcy Code which is necessary to effectuate the purpose of Chapter 15 of the Bankruptcy Code and protect the assets of the Debtors and the interests of their creditors.

**1.    Section 1521 Authorizes the Additional Relief, Including the Releases.**

111.    Upon recognition of a foreign proceeding, the Court may grant "any appropriate relief" to a foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a).  The Court's discretion to grant such relief is "exceedingly broad."  *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017).  Examples of such "appropriate relief" enumerated in Section 1521 include:

- staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);
- staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);
- suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a); and
- granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a)(1)-(3), (7).

112.    This Court has previously found that such "appropriate relief" includes enforcing schemes of arrangement that include releases, including third-party releases similar to the Releases.  *See In re Avanti Commc'ns Grp. PLC*, 582 B.R. 603, 616 (Bankr. S.D.N.Y. 2018) (enforcing English scheme of arrangement, including releases in favor of certain guarantors under sections 1521 and 1507 of the Bankruptcy Code).

113.    The facts in *Avanti* are similar to the case at bar.  There, the debt that was being restructured through a scheme of arrangement under U.K. law was issued by one member of a corporate group and guaranteed by its affiliates.  582 B.R. at 605.  The scheme contained releases in favor of both the debtor and the non-debtor guarantors, precluding the scheme creditors from seeking recovery under the guarantees.  *Id.* at 609.

114.    This Court recognized the *Avanti* scheme and granted the enforcement of the releases, including third party releases, in the United States.  The court based its rulings on its findings that (a) the scheme creditors had a full and fair opportunity to be heard in a manner consistent with United States due process standards, (b) under U.K. law, a class of creditors was bound only if creditors constituting a majority in number and representing not less than 75% in value voted in favor of the scheme, (c) unlike in a chapter 11 case, creditors could not be crammed down under a U.K. scheme, and (d) the failure "to enforce Guarantor Releases could result in prejudicial treatment of creditors to the detriment of the Debtor's reorganization efforts and prevent the fair and efficient administration of the Restructuring."  *Id.* at 618.

115.    The result should be the same here.  As in *Avanti*, much of the debt at issue in the Schemes was borrowed by one member of Boart Longyear's corporate group, with many of the affiliates guaranteeing such debt, and the Schemes contain the Releases of these Released Parties. Just like in *Avanti*, (a) the Scheme Creditors have a full and fair opportunity to be heard in the Australian Proceeding in a manner consistent with United States due process standards,[40] (b) similar to U.K. law, Australian law binds a class of creditors only if creditors comprising a majority in number and representing not less than 75% in value vote in favor of the Scheme,[41] (c) the Schemes do not contain cram down provisions,[42] and (d) failing to enforce the Releases would be prejudicial both to the Debtors and to the Scheme Creditors.

116.    Absent recognition of the Australian Proceeding, dissenting Scheme Creditors would be able to frustrate the terms of the Schemes by commencing actions against the Debtors and the Released Parties in the United States.  Thus, recognition and enforcement of the

---

[40]    Marshall Decl. at ¶ 35.

[41]    *Id.* at ¶ 38.

[42]    *Id.*

Schemes—including the Releases—is necessary to prevent such creditors from frustrating the purposes of the Debtors' restructuring, the foremost of which is to maximize value for **all** creditors. Such Additional Relief is "appropriate" under section 1521 of the Bankruptcy Code.

>    **2.**    **Stakeholders' Interests Are "Sufficiently Protected," Allowing the Court to Issue the Additional Relief.**

117.    Section 1522 of the Bankruptcy Code authorizes the Court to provide "additional relief" under section 1521 "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

118.    Courts consider three factors to determine whether such interests are sufficiently protected:

- the just treatment of all holders of claims against the bankruptcy estate;
- the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the foreign proceeding; and
- whether the distribution of proceeds of the foreign estate is substantially in accordance with U.S. law.

*In re ENNIA Caribe Holding N.V.*, 596 B.R. 316, 322 (Bankr. S.D.N.Y. 2018) (internal citation omitted). Each of these factors favors granting the requested Additional Relief.

119.    "The 'just treatment' factor is satisfied upon a showing that the applicable law provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors." *In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 170 (2d Cir. 2008)) (applying former section 304 of the Bankruptcy Code) (citations and internal quotation marks omitted); *In re Oi S.A.*, 587 B.R. 253, 267 (Bankr. S.D.N.Y. 2018).

120.    The Australian Proceeding satisfies this principle. As discussed above and as detailed in the Marshall Declaration, Australian schemes of arrangement are well-established and well-respected mechanisms to justly and fairly restructure obligations incurred by cross-border enterprises such as Boart Longyear. Indeed, the Corporations Act provides a comprehensive

procedure for the orderly resolution of claims and the equitable distribution of assets among the Scheme Creditors.[43]

121.    As explained in more detail in the Marshall Declaration, all Scheme Creditors were given notice of the Schemes, and the process for participating in or objecting to a Scheme is the same for United States creditors as all other creditors.[44]

122.    The third and final factor does not require that the Schemes produce an identical result to that which may be obtained under the Bankruptcy Code.  Rather, "[t]his factor requires simply that the 'foreign distribution scheme be substantially in accordance with United States bankruptcy law; it does not have to mirror the United States distribution rules.'"  *In re Oi S.A.*, 587 B.R. at 268-69.  Courts have found that "Australian law establishe[s] a different way to achieve similar goals" as the Bankruptcy Code.  *In re ABC Learning Centres Ltd.*, 728 F.3d 301, 311 (3d Cir. 2013).

123.    The Schemes provide for the *pro rata* distribution of a stipulated "pot" of value to the Scheme Creditors in each class, respecting their respective entitlements to certain collateral.  Such distribution scheme is commonplace in chapter 11 plans.  Moreover, all Scheme Creditors will have a full and fair opportunity to vote on, and be heard in connection with, the Schemes, and the Schemes will be subject to the approval of the Australian Court.

124.    Thus, the Scheme Creditors are "sufficiently protected," allowing the Court to grant the Additional Relief.

### 3.    The Requirements for a Permanent Injunction Are Satisfied.

125.    In addition, because relief under section 1521(a)(1), (2), (3), and (6) of the

---

[43]    *Id*. at ¶ 31.

[44]    *Id*. at ¶¶ 32-37.

Bankruptcy Code is tantamount to a permanent injunction, the "standards, procedures, and limitations applicable to an injunction apply to [such] relief." 11 U.S.C. § 1521(e). Courts in this Circuit will not issue a permanent injunction "unless the movant demonstrates both irreparable harm and a likelihood of success on the merits or a sufficiently serious question regarding the merits to make it a fair ground for litigation with the balance of hardship tipping decidedly in its favor." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir. 1989). "This Court has granted permanent injunctions in several cases to support proper implementation of a scheme of arrangement." *In re Olinda Star Ltd.*, 614 B.R. 28, 48 (Bankr. S.D.N.Y. 2020) (citing cases).

126.   A foreign representative is likely to succeed on the merits if recognition of a foreign proceeding under chapter 15 is appropriate. *See In re Petition of Garcia Avila*, 296 B.R. 95, 107 (Bankr. S.D.N.Y. 2003) (applying former section 304 of the Bankruptcy Code). As explained above, the Schemes meet all of the requirements for recognition, satisfying this prong of the injunction analysis.

127.   The second prong is also met. "[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and the fair distribution of assets in a single, centralized forum[.]" *Avila*, 296 B.R. at 114 (quoting 2 Resnik & Sommer, Collier on Bankruptcy ¶ 304.05, at 304-21 (15th ed. Rev. 2003)); *see also Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713-14 (2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the

detriment of the other creditors."). As explained above, the Debtors would suffer irreparable harm absent enforcement of the Schemes in the United States, including the Releases. If the Schemes are not given full force and effect in the United States, there is a risk that dissident Scheme Creditors may bring actions that would frustrate the purposes of the restructuring, the foremost of which is to maximize value for all creditors. Boart Longyear would be required to defend any such actions, causing depletion of the limited resources of the restructured business, jeopardizing the entire restructuring.

128.   Therefore, unless this Court grants the Additional Relief, irreparable harm could befall the Debtors and their estates, which might ultimately lead to the liquidation of Boart Longyear to the detriment of all of the Debtors' creditors and other stakeholders.

### 4.   Alternatively, Section 1507 Authorizes the Court to Enforce the Releases.

129.   In addition to the Court's ability to grant "appropriate relief" under section 1521 of the Bankruptcy Code, section 1507 of the Bankruptcy Code authorizes it to provide "additional assistance" to the Foreign Representative, provided that such assistance, "consistent with the principles of comity," will reasonably assure—

- just treatment of all holders of claims against or interests in the debtor's property;
- protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
- prevention of preferential or fraudulent dispositions of property of the debtor;
- distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
- if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(a)-(b). "In the chapter 15 context, judges in this Court have often enforced third-party releases in foreign proceedings under section 1507 of the Bankruptcy Code." *Avanti*

*Commc'ns Grp.*, 582 B.R. at 616; *see, e.g.*, *In re Sino-Forest Corp.*, 501 B.R. 655, 666 (Bankr. S.D.N.Y. 2013) (enforcing settlement approved in connection with a Canadian scheme, including third-party releases); *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 698 (Bankr. S.D.N.Y. 2010) (recognizing Canadian scheme and enforcing related orders, including third-party releases because "[t]he U.S. and Canada share the same common law traditions and fundamental principles of law" and "Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with U.S. due process.").

130.    As explained below, the outcome should be no different here.

### a.    Comity Compels Enforcement of the Releases.

131.    Ultimately, in "deciding whether to grant appropriate relief or additional assistance under chapter 15, courts are guided by principles of comity and cooperation with foreign courts." *Avanti Commc'ns Grp.*, 582 B.R. at 615; *Metcalfe*, 421 B.R. at 696 ("Section 1507 directs the court to consider comity in granting additional assistance to the foreign representative[.]"). Comity does not require that a foreign proceeding has an identical or equivalent result that may be obtained under American law. Rather, "[i]t is sufficient if the result is comparable." *Vitro*, 701 F.3d at 1044; *see also Sino-Forest Corp.*, 501 B.R. at 662 ("[D]eference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States.").

132.    "[W]hen the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings." *Metcalfe*, 421 B.R. at 698. Thus, courts routinely extend comity to orders from such sister common law jurisdictions, such as Australia. *See, e.g.*, *In re Octaviar Admin. Pty Ltd.*, 511 B.R. at 374 (holding that granting recognition of the Australian proceeding is consistent with the goals of chapter 15,

including facilitating and promoting cooperation between courts); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 340 (Bankr. D. Del. 2010) (holding that "[r]ecognition of the Australian Proceedings as foreign main proceedings is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States"); *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1000 (2d Cir. 1993) (affirming recognition and granting comity to liquidation proceeding in Australia).

133.    As explained above, the Australian Proceeding provides the Scheme Creditors with a full and fair opportunity to vote on and be heard in connection with the Schemes in a manner consistent with the United States due process standards.  Further, the distribution of the estates' assets under the Schemes is not unlike that under the Bankruptcy Code.  On the other hand, failure to enforce the Releases would materially prejudice both the Debtors and the Scheme Creditors that vote in favor of the Schemes and may jeopardize the underpinning of the Schemes.

134.    Thus, the Releases should be enforced in the United States as a matter of comity.

**b.    Section 1507(b) of the Bankruptcy Code Is Satisfied.**

135.    For the reasons explained above, the specific provisions of section 1507(b) of the Bankruptcy Code either favor enforcing the Releases or are neutral: (a) the Australian Proceeding provides "just treatment" to all of the Debtors' stakeholders in a manner consistent with United States due process standards; (b) all Scheme Creditors, including United States creditors, were given equal notice and participation rights in the Scheme process; (c) the Schemes' distribution of estate assets is consistent with that common in chapter 11; (d) neither the Releases nor the Schemes generally will promote preferential or fraudulent dispositions of property; and (e) the Australian Proceeding does not concern any individual debtor.

136.    Courts in this District have granted additional assistance to foreign representatives by enforcing releases, including third-party releases, approved by Australian and other common

law courts, similar to the Releases.  *See*, *e.g.*, *In re Petra Diamonds US$ Treasury plc*, No. 20-12874 (MG) [ECF No. 16] (Bankr. S.D.N.Y. Jan. 14, 2021) (enforcing releases contained in English scheme); *In re Noble Group Limited*, No. 18-13133 (SMB) [ECF No. 30] (Bankr. S.D.N.Y. Nov. 15, 2018) (same); *In re Quintis Limited et al.*, No. 18-12739 (MG) [ECF No. 14] (Bankr. S.D.N.Y. Oct. 11, 2018) (enforcing releases in Australian scheme);  *In re Boart Longyear Limited, et al.*, No. 17-11156 (MEW) [ECF No. 33] (Bankr. S.D.N.Y. May 22, 2017) (same); *In re Emeco Holdings Limited*, No. 16-13080 (MKV) [ECF No. 12] (Bankr. S.D.N.Y. Nov. 30, 2016) (same).

### 5.   Additional Relief is Also Warranted Pursuant to Sections 105(a) and 1525(a) of the Bankruptcy Code.

137.   Section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Similarly, section 1525(a) of the Bankruptcy Code directs the Court to "cooperate to the maximum extent possible with a foreign court or a foreign representative."

138.   The Additional Relief is necessary to complete the value-maximizing, creditor-approved restructuring.   Approving the Additional Relief will promote the principles of cooperation mandated by section 1525(a) of the Bankruptcy Code by facilitating the fair, efficient, and centralized administration of claims in the Australian Proceeding.  As such, the Court has the power to, and should, provide the Additional Relief.

### E.   The Requested Relief is Not "Manifestly Contrary" to U.S. Public Policy.

139.   A court may deny a request for relief in a chapter 15 case that would be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  "The public policy exception set forth in section 1506 is narrowly construed and invoked only under exceptional circumstances that concern matters of fundamental importance to the United States."  *In re Poymanov*, 571 B.R.

24, 38 (Bankr. S.D.N.Y. 2017); *see also Fairfield Sentry Ltd.*, 714 F.3d at 139 ("Section 1506 does

not create an exception for *any* action under Chapter 15 that may conflict with public policy, but

only an action that is 'manifestly contrary.'").  "Accordingly, a foreign judgment should generally

be accorded comity if its proceedings are fair and impartial." *Collins v. Oilsands Quest Inc.*, 484

B.R. 593, 597 (S.D.N.Y. 2012) (citation and internal quotation marks omitted); *Metcalfe*, 421 B.R.

at 697.  With respect to third-party releases, in "this Circuit, where the third-party releases are not

categorically prohibited, it cannot be argued that the issuance of such releases is manifestly

contrary to public policy." *Sino-Forest Corp.*, 501 B.R. at 665.

140.    As explained more fully above, the Australian Proceeding and the Schemes meet

the standards of fairness and impartiality.  The Australian Court's exercise of jurisdiction over the

Debtors and the Schemes was proper pursuant to Part 5.1 of the Corporations Act (and in particular

section 411).  Further, the specific steps undertaken in the Australian Proceeding demonstrate a

commitment to due process, which includes adequate notice and service of process.  Moreover,

the steps undertaken and to be undertaken in order for the Schemes to become effective sufficiently

conform to U.S. notion of due process.  Furthermore, all of the Scheme Creditors have the same

rights to participate in the Schemes regardless of their location.

141.    Additionally, failure to grant the Additional Relief, including enjoining the Scheme

Creditors from bringing suit in the United States against the Released Parties, may frustrate the

purpose of the Schemes.  The failure to provide such relief would be contrary to public policy, not

*vice versa*.  11 U.S.C. § 1501(a) (proclaiming the purpose of chapter 15 to be, among other

objectives, "the rescue of financially troubled business" and providing for the "fair and efficient

administration of cross-border insolvencies").  Avoiding such a potential outcome through the

formal recognition of the Australian Proceeding and enforcement of the Schemes, including the

Additional Relief, in the United States is consistent with U.S. public policy embodied in the Bankruptcy Code.

142.    For all these reasons, the Additional Relief sought by the Foreign Representative—including enforcing Releases in the United States—is appropriate pursuant to sections 1507 and 1521(a) of the Bankruptcy Code.

## **SATISFACTION OF LOCAL RULE BANKRUPTCY RULE 9013-1(a)**

143.    The Verified Petition includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to the Verified Petition.  Accordingly, the Foreign Representative submits that the Verified Petition satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## **NOTICE**

144.    Notice of the Verified Petition and the relief sought herein has been provided to the Chapter 15 Notice Parties identified in **Exhibit 2** to the proposed order annexed to the *Motion for an Order (I) Scheduling the Hearing and (II) Specifying Form and Manner of Service of Notice* hereto as required under Bankruptcy Rule 2002(q)(1).  The Foreign Representative submits that no other or further notice need be provided.

## **NO PRIOR REQUEST**

145.    No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Foreign Representative respectfully requests entry of the proposed order, attached hereto as **<u>Exhibit A</u>**, granting the relief requested and such other and further relief as the Court may deem proper.

New York, New York
Dated:  August 17, 2021

<div style="margin-left:40%;">

/s/  Dennis F. Dunne_____
Dennis F. Dunne
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:     (212) 530-5000
Facsimile:      (212) 530-5219
Email:           ddunne@milbank.com

Thomas R. Kreller (*pro hac vice* pending)
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, California 90067
Telephone:     (424) 386-4000
Facsimile:      (213) 629-5063
Email:           tkreller@milbank.com

*Counsel to the Foreign Representative*

</div>

Dennis F. Dunne                        Thomas R. Kreller (*pro hac vice* pending)
**MILBANK LLP**                        **MILBANK LLP**
55 Hudson Yards                        2029 Century Park East
New York, New York 10001               33rd Floor
Telephone:     (212) 530-5000          Los Angeles, California 90067
Facsimile:     (212) 530-5219          Telephone:     (424) 386-4000
                                       Facsimile:     (213) 629-5063

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 15 |
| BOART LONGYEAR LIMITED *et al.*, | Case No. 21-11465 (__) |
| Debtors in a Foreign Proceeding.[1] | (Joint Administration Requested) |

## <u>STATEMENT OF VERIFICATION</u>

I, Nora R. Pincus, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

1.      I am the duly appointed foreign representative of each of the above-captioned debtors.  I have full authority to verify this Verified Petition.

2.      I have read the foregoing Verified Petition and I am informed and believe that the factual allegations contained therein are true and accurate.

---

[1]  The debtors in these chapter 15 cases, along with the last three digits of each debtor's Australian Company Number, are: Boart Longyear Limited (728), Boart Longyear Management Pty Limited (545), Boart Longyear Australia Pty Limited (025), Boart Longyear Investments Pty Limited (373), and Votraint No. 1609 Pty Limited (272).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of August, 2021
in Salt Lake City, Utah

_____

Nora R. Pincus, as
Foreign Representative

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 15 |
| | ) | |
| BOART LONGYEAR LIMITED *et al.*, | ) | Case No. 21-11465 (__) |
| | ) | |
| Debtors in a Foreign Proceeding. [1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

## ORDER RECOGNIZING FOREIGN MAIN
## PROCEEDING AND GRANTING RELATED RELIEF

Upon the *Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Related Relief* [Docket No. 2] (the "Verified Petition")[2] of Nora R. Pincus, in her capacity as the Foreign Representative of the Debtors, for an order granting: (a) recognition of the Australian Proceeding as the foreign main proceeding for each Debtor pursuant to sections 1515 and 1517 of the Bankruptcy Code; (b) recognition of the Foreign Representative as the "foreign representative" of the Debtors as such term is defined in section 101(24) of the Bankruptcy Code; and (c) certain other relief; upon consideration of the Verified Petition, the Marshall Declaration, the Pincus Declaration, and all other pleadings and papers in this case; and upon the record of the hearing (the "Hearing") and all of the proceedings had before the Court, **IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

---

[1]    The debtors in these chapter 15 cases, along with the last three digits of each debtor's Australian Company Number, are: Boart Longyear Limited (728), Boart Longyear Management Pty Limited (545), Boart Longyear Australia Pty Limited (025), Boart Longyear Investments Pty Limited (373), and Votraint No. 1609 Pty Limited (272).

[2]    Capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Verified Petition.

[3]    The findings and conclusions set forth herein and on the record of the hearing on the Verified Petition constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). To the extent any of the findings of fact constitute conclusions of law, they are adopted as such; to the extent any of the conclusions of law constitute findings of fact they are adopted as such.

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference* dated January 31, 2012, Reference M-431, *In re*

*Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.).

B.      Consideration of the Verified Petition and the requested relief is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(P).

C.      Venue is proper before this Court pursuant to 28 U.S.C. § 1410.

D.      This Court may enter a final order consistent with Article III of the United States

Constitution.

E.      Good, sufficient, appropriate, and timely notice of the filing of, and the Hearing on,

the Verified Petition was given, which notice is deemed adequate for all purposes, and no further

notice need be given.

F.      No objections or other responses were filed that have not been overruled,

withdrawn, or otherwise resolved.

G.      The Chapter 15 Cases were properly commenced pursuant to sections 1504, 1509,

and 1515 of the Bankruptcy Code.

H.      The Verified Petition satisfies the requirements of section 1515 of the Bankruptcy

Code and Bankruptcy Rule 1007(a)(4).

I.      Each of the Debtors has property in the United States and is eligible to be a debtor

in a chapter 15 case pursuant to sections 109 and 1501 of the Bankruptcy Code.

J.      The Foreign Representative is a "person" pursuant to section 101(41) of the

Bankruptcy Code and is the duly appointed "foreign representative" of the Debtors as such term

is defined in section 101(24) of the Bankruptcy Code with respect to the Australian Proceeding.

K.      The Australian Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code, entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

L.      The Australian Proceeding is pending in Australia, where each of the Debtors has its "center of its main interests" as used in section 1517(b)(1) of the Bankruptcy Code. Accordingly, the Australian Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code, entitled to recognition as such pursuant to section 1517(b)(1) of the Bankruptcy Code.

M.      The Debtor and the Foreign Representative are entitled to all of the relief set forth in section 1520 of the Bankruptcy Code without limitation.

N.      The Debtor and the Foreign Representative are entitled to all of the relief set forth herein under sections 1507, 1521, and 1525 of the Bankruptcy Code.

O.      Each of the injunctions contained in this Order: (a) is within the Court's jurisdiction; (b) is essential to the success of the Schemes; (c) is an integral element of the Schemes essential to its effectuation; (d) confers material benefits on, and is in the best interests of, the Debtors and their creditors, including, without limitation, the Scheme Creditors; and (e) is important to the overall objectives of the restructuring of the Debtors and their non-Debtor affiliates.  The relief granted hereby will not cause any hardship to any party in interest that is not outweighed by the benefits of the relief granted.

P.      Absent the relief granted hereby, the Debtors and the other Released Parties or their respective properties may be subject to judicial, quasi-judicial, arbitration, administrative or regulatory actions or proceedings in the United States in direct contravention of the Australian Proceeding and the Schemes, thereby interfering with and causing harm to the Debtors, their

creditors, the other Released Parties, and other parties in interest in the Australian Proceeding and, as a result, the Debtors, their creditors, the other Released Parties, and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

Q.       Absent the relief granted hereby, the restructuring contemplated by the Schemes and approved by the Australian Court may be frustrated by the actions of individual Scheme Creditors, a result contrary to the purposes of chapter 15 as reflected in section 1501(a) of the Bankruptcy Code.

R.       All creditors and other parties in interest are sufficiently protected by the grant of relief ordered hereby in accordance with section 1522(a) of the Bankruptcy Code.

S.       The terms of the Schemes are not contrary to the public policy of the United States. The relief granted hereby pursuant to sections 1507, 1515, 1517, 1520, 1521, and 1525 of the Bankruptcy Code is necessary to effectuate the purposes of chapter 15, to protect the Debtor and the interests of its creditors, is in the interest of the public and international comity, and is not manifestly contrary to U.S. public policy or the policies of the Bankruptcy Code.

T.       The relief granted hereby is necessary to effectuate the purposes and objectives of chapter 15 and to protect the interests of the Debtors and their creditors.

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFORE, IT IS HEREBY ORDERED THAT:**

1.       The Verified Petition is granted as set forth herein.

2.       All objections, if any, to the Verified Petition and Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Hearing, or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits.

3.       The Australian Proceeding is a collective, court-supervised proceeding governed in

accordance with applicable Australian law, as it may be amended from time to time, and is granted

recognition as a "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy Code)

pursuant to sections 1517(a) and (b)(1) of the Bankruptcy Code, and all the effects of recognition

of a foreign main proceeding set forth in section 1520 of the Bankruptcy Code shall apply to each

Debtor, including, without limitation, the application of the automatic stay under section 362 of

the Bankruptcy Code to the Debtors and to their property within the territorial jurisdiction of the

United States.

4.    The Foreign Representative is the duly appointed and authorized "foreign

representative" of the Debtors within the meaning of section 101(24) of the Bankruptcy Code, and

is authorized to act on behalf of the Debtors in the Chapter 15 Cases.

5.    The Foreign Representative is the exclusive representative of the Debtors in the

United States, and the administration, realization, and distribution of any and all of the Debtors'

assets within the territorial jurisdiction of the United States is entrusted to the Foreign

Representative.

6.    The Debtors and the Foreign Representative are entitled to all of the relief set forth

herein under sections 105(a), 1507, 1520, 1521, and 1525 of the Bankruptcy Code.

7.    The Australian Proceeding and the Schemes (including the Implementation Deeds)

are hereby: (a) recognized, granted comity, and given full force and effect in the United States on

a final basis, including any waivers, releases, discharges of debt, and injunctions against

enforcement of claims or debts against the Debtors or the Released Parties, and (b) shall be binding

on and enforceable against all parties in the United States, whether or not such parties actually

voted in favor of the applicable Scheme, participated in a Scheme Meeting, or appeared in the

Australian Proceeding.

8.      All persons and entities subject to the jurisdiction of the United States are permanently enjoined and restrained from taking any action inconsistent with, or interfering with the enforcement and implementation of, the Schemes, including, without limitation:

     a.      taking any of the following actions on account of any Scheme Claim:

        (i)      taking or continuing any act to obtain possession of, or exercise control over, including but not limited to, attaching, repossessing, seizing, or disposing of, as applicable, any of the Debtors' or other Released Parties' tangible or intangible property, including any proceeds thereof, that is located within the territorial jurisdiction of the United States (collectively, the "Applicable Property"), including without limitation any action pursuant to sections 361, 362, or 365(e) of the Bankruptcy Code;

        (ii)      commencing, continuing, or enforcing any action or legal proceeding within the territorial jurisdiction of the United States (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever), including by way of counterclaim (each, an "Action") against the Debtors, the Released Parties, or any of the Applicable Property; or

        (iii)      commencing or continuing any act or Action to create, perfect or enforce any lien, setoff or claim (including a contract claim) against the Debtors, the Released Parties, or the Applicable Property; provided, however, that no action described in sections 555, 556, 557, 559, 560, 561, 562 and 1519(d) and (f) of the Bankruptcy Code shall be enjoined by such injunction.

     b.      commencing any Action in the territorial jurisdiction of the United States against the Debtors, the Foreign Representatives, the Released Parties, or any of their respective successors, directors, officers, agents, employees, representatives, advisors, or attorneys in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken in connection with the Chapter 15 Cases, the Schemes (including the Implementation Deeds), the Convening Orders or the Sanction Order or to resolve any dispute arising out of the Schemes (including the Implementation Deeds), the Convening Orders or the Sanction Order; or

     c.      declaring or considering the filing of the Australian Proceeding or the Chapter 15 Cases a default or event of default under any agreement, contract or arrangement.

9.      As of the Schemes Implementation Date, any judgment, wherever and whenever

obtained, to the extent such judgment is a determination of liability of a Debtor or a Released Party with respect to any debt or liability cancelled, discharged, or restructured under the Schemes or as a result of Australian law pertaining thereto, is unenforceable in the United States to the extent its enforcement would be inconsistent with the Schemes (including the Implementation Deeds), the Convening Orders or the Sanction Order.

10.     This Order is without prejudice to the Foreign Representative requesting any additional relief in the Chapter 15 Cases, including seeking recognition and enforcement in the United States of any further orders issued by the Australian Court, including any final order sanctioning the Schemes, as such order may be amended or supplemented from time to time.

11.     The Foreign Representative, the Debtors, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules or orders of this Court.

12.     The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

13.     No action taken by the Foreign Representative, the Debtors, or their respective successors, agents, representatives, advisors, or counsel in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the Australian Proceeding, this Order, the Chapter 15 Cases, an adversary proceeding herein, if any, or any further proceeding commenced hereunder, shall constitute a waiver of the rights or benefits afforded such persons under 11 U.S.C. §§ 306 and 1510.

14.     The banks and financial institutions with which the Debtors maintain bank accounts in the United States or on which checks are drawn or electronic payment requests made in payment of any prepetition or postpetition obligations are authorized and directed to continue to service and

administer (including charging all applicable fees and expenses) the Debtors' bank accounts without interruption and in the ordinary course and to receive, process, honor and pay any and all such checks, drafts, wires and automatic clearing house transfers issued, whether issued before or after the Petition Date and draw on the Debtors' bank accounts by the respective holders and makers thereof and at the direction of the Foreign Representative or the Debtors, as the case may be, and may rely on representations by the Foreign Representative or Debtors without liability to any other party for such reliance; provided, however, that nothing herein shall affect the Debtors' obligations to comply with any cash management requirements under their secured debt facilities.

15.    Except as otherwise set forth in paragraph 8 herein, no provision of this Order, or any Bankruptcy Code provisions that become effective upon entry of this Order, shall impair or restrict the terms, conditions, obligations, and limitations of the Existing ABL, or any of the other documents and agreements relating to the Existing ABL, all of which terms, conditions, obligations and limitations shall remain in force and effect.

16.    Notwithstanding anything to the contrary in this Order, no provision of this Order, or any Bankruptcy Code provisions that become effective upon entry of this Order (including, without limitation, 11 U.S.C. § 552), shall restrict or prohibit the Debtors from granting, or PNC Bank, National Association ("PNC"), from receiving, continuing grants of security interests in current or after-acquired property of one or more of the Debtors as provided by, and that secure the obligations under, the Existing ABL, which security interests shall continue from and after the date of the commencement of these Chapter 15 Cases with the same effect as if these Chapter 15 Cases had not been commenced.

17.    Entry of this Order is without prejudice to PNC's right to request other and further relief as may be necessary, desirable, or appropriate in order to ensure that PNC's interests are

sufficiently protected, as required by sections 1520 and/or 1522 of the Bankruptcy Code.

18.     The Australian Court shall have exclusive jurisdiction to hear and determine any suit, action, claim, or proceeding, and to settle any dispute that may arise out of the construction or interpretation of the Schemes in connection with the administration of the Schemes; provided, however, that nothing in this Order affects the validity of provisions determining governing law and jurisdiction, whether contained in any contract between the Debtor and any of the Scheme Creditors or otherwise.

19.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to interpretation or implementation of this Order, including, but not limited to: (a) the enforcement, amendment or modification of this Order; (b) any requests for additional relief or any adversary proceeding brought in or through these Chapter 15 Cases; and (c) any request by an entity for relief from the provisions of this Order, for cause shown, as to any of the foregoing, and provided the same is properly commenced and within the jurisdiction of this Court.

20.     This Order is without prejudice to the Foreign Representative requesting any additional relief in these Chapter 15 Cases, including seeking recognition and enforcement by this Court of any further orders issued by the Australian Court.

21.     This Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

Dated:  New York, New York
        _____, 2021

_____
UNITED STATES BANKRUPTCY JUDGE